COMMONWEALTH vs. PHILIP S., a juvenile.[1]

Essex. January 4, 1993. - April 12, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Constitutional Law*, Waiver of constitutional rights, Admissions and confessions, Parent and child. *Waiver*.

Custodial statements made by a juvenile, then age twelve years and eleven months, to members of a city fire department and the State police were improperly suppressed from evidence, where the interrogating officials reasonably relied on the presence of the juvenile's mother as an adult interested in his welfare [809-810]; where the parent and child were given an actual opportunity to discuss the juvenile's rights on both occasions on which the juvenile was questioned and between them chose the best course to follow [811-813]; and where, under a totality of the circumstances analysis, there was nothing to show that the juvenile's statements were involuntary [813-814].

COMPLAINT received and sworn to in the Lawrence Division of the District Court Department on December 21, 1989.

A pretrial motion to suppress evidence was heard by *Isaac Borenstein, J.*

After review by the Appeals Court, the Supreme Judicial Court granted a request for direct appellate review.

*S. Jane Haggerty*, Assistant District Attorney, for the Commonwealth.

*Robert F. Kelley* for the juvenile.

GREANEY, J. The juvenile, aged twelve years and eleven months at the time of the events recounted below, is charged in the juvenile session of the Lawrence Division of the District Court with delinquency by reason of manslaughter. During interviews on December 18 and 20, 1989, the juvenile

[1] A fictitious name is used in this opinion for the juvenile and his family.

made oral admissions and signed two statements, in which he admitted that he had set fire to a couch located on the porch of his family's second-floor apartment on the evening of December 17, 989. The fire spread throughout the three-story wooden dwelling. A Lawrence fire fighter was severely injured while fighting the fire and died of his injuries on December 20, 1989.

The juvenile moved to suppress his admissions and statements. After an evidentiary hearing, a District Court judge, sitting in the juvenile session, allowed the motion. The Commonwealth was permitted to appeal, see Mass. R. Crim. P. 15 (a), 378 Mass. 882 (1979), and the Appeals Court affirmed the order allowing suppression. 32 Mass. App. Ct. 720 (1992). We granted the Commonwealth's application for further appellate review and now reverse the order allowing the motion to suppress.

The facts are set forth in the opinion of the Appeals Court and need not be fully repeated here.[2] 32 Mass. App. Ct. at 722-725. We summarize only what is relevant to a discussion of the issues. As indicated, the juvenile was interviewed by investigating officials twice, on December 18 and 20, 1989.

---

[2]The Appeals Court opinion states that "[t]he subsidiary facts . . . are contained in the judge's findings and in the record of the proceedings before him . . . [and] are largely undisputed." 32 Mass. App. Ct. 720, 721. The judge made a few, brief findings of fact in the course of his discussion of the legal issues, but he did not make comprehensive subsidiary findings of fact as we usually see them. The facts stated by the Appeals Court are principally drawn from the evidence at the hearing which was furnished by the Commonwealth's witnesses, a Lawrence fire fighter and three State police officers. (The juvenile presented no witnesses at the hearing.) The judge did not express any disbelief of the Commonwealth's evidence, nor did he reject any of it. Rather, he appears to have accepted as accurate the bulk of the evidence, and he based suppression, as we shall discuss subsequently, on what he thought the controlling law required in light of the evidence. This approach leaves the case open to our independent review. *Commonwealth* v. *Dunn*, 407 Mass. 798, 804-805 (1990). Consequently, the case is not one which would benefit from a remand for the making of findings of fact because the relevant facts are as the Appeals Court indicated "largely undisputed." See *Commonwealth* v. *A Juvenile*, 402 Mass. 275, 276 n.1 (1988); *Commonwealth* v. *Carrington*, 20 Mass. App. Ct. 525, 526 (1985).

The December 18 interview was held at the fire station. The juvenile was accompanied by his mother, Mrs. Smith (the juvenile's father, a taxicab driver, was unavailable). The inquiry on this day was conducted by Captain Kevin Ord of the Lawrence fire department, a second fire fighter, and State police Officer Neal Dwyer. After ascertaining that the juvenile was not being truthful about how the fire started, Officer Dwyer gave the juvenile complete Miranda warnings by reading them from a standard police-issued card. Officer Dwyer asked the juvenile and Mrs. Smith whether they understood each particular warning after he read that warning from the card.[3] Neither Mrs. Smith nor the juvenile asked any questions; both indicated that they understood their rights. Mrs. Smith did not ask for an attorney. Officer Dwyer then read the waiver provisions on the other side of the card, asked the juvenile and Mrs. Smith whether they understood the provisions, and informed them in "straight talk" that, if the juvenile chose to waive his rights and discuss the incident, the interview could be terminated at any point. The juvenile indicated his willingness to waive his rights and remain and speak with the investigating officials. Mrs. Smith signed the card containing the Miranda warnings and waiver. All three of the officials then left the room for between five and fifteen minutes, allowing Mrs. Smith and the juvenile to "talk over whatever they wanted." They advised the juvenile to tell his mother the truth and to tell them the truth when they returned. When the interview resumed, Mrs. Smith repeatedly encouraged the juvenile to tell the truth about the fire.

During the remainder of the interview, the juvenile changed his story several times. At one point, the juvenile

---

[3]At the point of administration of Miranda warnings, after the juvenile had made statements which indicated that he had been untruthful about his role in the fire, the juvenile was in custody. He was in custody at the December 20 interview as well. The reasons for this conclusion, which was not the subject of an express finding by the judge, are set forth in the opinion of the Appeals Court with which we agree. See 32 Mass. App. Ct. at 722.

became angry and ran out of the room. The investigating officials did not follow him. Officer Dwyer assumed the interview was over and went to another room and began interviewing other witnesses. Captain Ord also left and did not return. On her own initiative, the juvenile's mother brought him back, and the interview resumed. The juvenile eventually initialed a statement in which he admitted to having set the fire unintentionally.

On December 20, 1989, the juvenile returned to the fire station. His mother met him there and was present while he was interviewed by State police Officers John Garvin and Paul Zipper. Officer Garvin read the juvenile and his mother Miranda warnings and the waiver provisions from a printed card. Officer Garvin informed them that the juvenile did not have to make any statement, and he inquired whether the juvenile and Mrs. Smith understood the warnings. Both responded affirmatively. Officer Garvin then asked whether the juvenile wished to waive his rights and speak with the officers. The juvenile and Mrs. Smith responded affirmatively. Both the juvenile and Mrs. Smith signed the waiver provision on the Miranda card. The officers then left the juvenile and his mother alone together for somewhere between five and fifteen minutes, instructing them to discuss the juvenile's Miranda rights. The juvenile and his mother were not conversing when the officers reentered the room, and it is not known what, if anything, had been discussed by them during their time alone. Before reentering the room, Officer Garvin asked, "Would you like to talk to us now? I would like to get a statement from you regarding what happened with the fire." The juvenile answered "yes," and Mrs. Smith stated that she wanted the juvenile to tell the truth.

The ensuing interview lasted approximately four hours, with two or three breaks, initiated by the officers, each lasting between five and twenty minutes. The officers left the room during these breaks. At some point, the juvenile was offered, and declined, a soda. The juvenile's story changed frequently during the interview. Mrs. Smith on occasion became frustrated with his responses and urged him to tell the

truth. At the end of the interview, the juvenile and his mother reviewed for accuracy, and initialed, each page of an inculpatory statement. When the interview was concluded, Mrs. Smith did not want the juvenile to return home with her. At her suggestion, a social worker who had previously counseled the juvenile was brought to the fire station and arranged for an accommodation for the juvenile in a juvenile home.

The judge concluded that the juvenile's motion to suppress should be allowed because the Commonwealth had not shown that Mrs. Smith satisfied our "interested adult" rule and that an actual consultation had taken place between the juvenile and his mother prior to the interviews. As an alternative basis for allowing suppression, the judge concluded that the "totality of the circumstances" indicated that the juvenile's statements were involuntary. In reaching the conclusion about involuntariness, the judge relied on the juvenile's age and lack of familiarity with police practice; the height (over six feet), and bearing (including their concealed handguns) of the interviewing officers; their urgings that the juvenile tell the truth; the fact that the juvenile and his mother were furnished Miranda warnings only twice; and the additional fact that the officers did not remind the juvenile that he and his mother were free to leave.

We turn now to the principles that govern the appeal. Investigating officials permissibly may interview a juvenile suspected of a crime, and a statement that is the product of that interview, if knowing and voluntary, may be admitted at trial against the juvenile. See *Commonwealth v. Tavares*, 385 Mass. 140, 146, cert. denied, 457 U.S. 1137 (1982); *Commonwealth v. Daniels*, 366 Mass. 601, 605 (1975). However, "courts must proceed with 'special caution' when reviewing purported waivers of constitutional rights" by juveniles, *Commonwealth v. Berry*, 410 Mass. 31, 34 (1991); *Commonwealth v. A Juvenile*, 389 Mass. 128, 133 (1983), and certain procedures are to be followed in obtaining a juvenile's waiver of his rights against self-incrimination. See *Commonwealth v. Ward*, 412 Mass. 395 (1992); *Commonwealth v.*

*Berry, supra; Commonwealth* v. *Guyton,* 405 Mass. 497 (1989); *Commonwealth* v. *A Juvenile,* 389 Mass. 128 (1983); *Commonwealth* v. *Day,* 387 Mass. 915, 921 (1983). When the juvenile is under the age of fourteen, as was the juvenile in this case, those procedures require that the Commonwealth "show that a parent or an interested adult was present, understood the [Miranda] warnings, and had the opportunity to explain his rights to the juvenile so that the juvenile understands the significance of waiver of these rights." *Commonwealth* v. *A Juvenile, supra* at 134. *Commonwealth* v. *Berry, supra* at 35 n.2.

The judge concluded that Mrs. Smith was not an interested adult because she had not actually engaged in " 'counseling' [the juvenile] vis à vis the exercise of his privilege [against self-incrimination]." The judge also considered that Mrs. Smith was not an interested adult because she repeatedly urged her son to tell the truth; she brought him back for further interrogation when he angrily left the room during the December 18 interview; and she became upset at times over his behavior and responses. The judge also relied on facts that, at the close of the second interview, Mrs. Smith did not want her son to return home with her, and she did not attend care and protection proceedings concerning her son instituted in June, 1990.

*Interested adult.* In deciding whether an adult advising a juvenile during a custodial interrogation is an interested adult, the facts must be viewed from the perspective of the officials conducting the interview. *Commonwealth* v. *Berry, supra* at 37. If, at the time of the interrogation (as assessed by objective standards), it should have been reasonably apparent to the officials questioning a juvenile that the adult who was present on his or her behalf lacked capacity to appreciate the juvenile's situation and to give advice, or was actually antagonistic toward the juvenile, a finding would be warranted that the juvenile has not been assisted by an interested adult and did not have the opportunity for consultation contemplated by our rule. *Id.* at 36-37.

The judge did not find that Mrs. Smith lacked capacity to appreciate the situation facing her son or to give him appropriate advice. There is no objective basis in the record to support a finding that interviewing officials could have concluded that Mrs. Smith was antagonistic toward her son. She appeared concerned about her son, not angry with him, attended both interviews, and was attentive to the administration of Miranda warnings and provisions about waiving rights. The juvenile appears to have considered his relationship with his mother intact. Cf. *Commonwealth* v. *Smith*, 472 Pa. 492 (1977) (father who refused to accompany juvenile suspect to police station for interrogation not an interested adult). Whatever distress was felt by Mrs. Smith did not affect her comprehension of events or her willingness to participate in proceedings involving her son. See *Commonwealth* v. *Berry*, *supra* at 35-36. The interrogating officials would not be expected to know of the psychological atmosphere of the juvenile's home or of any undisclosed problems in his relationship with his mother. They had before them objective facts indicating that Mrs. Smith was a parent who comprehended the events that had occurred and were occurring and who could assist her son in the choices he had to make.[4] We reject the notion that a parent who fails to tell a child not to speak to interviewing officials, who advises the child to tell the truth, or who fails to seek legal assistance immediately is a disinterested parent. Our interested adult rule, which we conclude was satisfied in this case, is not violated because a parent fails to provide what, in hindsight and from a legal perspective, might have been optimum advice.

---

[4]The interviewing officials could not have anticipated that Mrs. Smith would not want the juvenile to come home with her, when the December 20 interview was completed. Interviewing officials will make their assessment of the relationship between parent and juvenile at the outset, and during the course of, an interview. Evidence of events occurring at the close of an interview logically cannot be used to support a finding that the officials should have known a parent could not act as an interested adult. Certainly, officials interviewing the juvenile in Mrs. Smith's company in December, 1989, could not have taken into account care and protection proceedings initiated in June, 1990.

*Actual consultation.* In *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134 (1983), this court "conclude[d] that, for the Commonwealth successfully to demonstrate a knowing and intelligent waiver by a juvenile [under the age of fourteen] . . . it should show that a parent or an interested adult was present, understood the warnings, and had the opportunity to explain his rights to the juvenile so that the juvenile understands the significance of waiver of these rights." The juvenile urges us to read this passage as requiring the Commonwealth to prove that the juvenile, and the adult assisting him, made full use of the opportunity provided to them actually to discuss the juvenile's rights and the possible consequences of a waiver. The judge accepted the argument. We reject it because such an interpretation would impose a virtually impossible burden of proof on the Commonwealth without appreciably adding to the protection afforded to juveniles.

We conclude that the juvenile and his mother had the required actual opportunity to discuss his rights on both occasions on which he was questioned. On December 18, after Officer Dwyer furnished the juvenile his Miranda warnings, the officers left the juvenile and his mother alone in the room for five to fifteen minutes.[5] On December 20, after the officers read the Miranda warnings to both, mother and son were again left alone. On this occasion they were specifically

---

[5]When the officers left the juvenile and his mother alone during the first interview, after reading the Miranda warnings to both, they did not instruct Mrs. Smith to discuss her son's rights with him. We have never stated that investigating officials must expressly inform a juvenile and his or her parent that they should use their opportunity to confer for a discussion of the juvenile's rights, and we do not do so now. See *Commonwealth* v. *Ward*, 412 Mass. 395, 397 (1992). In this case, the juvenile and his mother were left alone immediately after the warnings were read and told to "talk over whatever they wanted." The investigating officials also indicated that they wanted to know the truth. We think this was a sufficient indication to the juvenile's mother that she and her son should use the private consultation to discuss the best course to follow, in light of the information they had just received. The better practice, however, with any juvenile is for the investigating officials explicitly to inform the juvenile's parent, or other interested adult, that an opportunity is being furnished for the two to confer about the juvenile's rights.

instructed to discuss the juvenile's rights. It is not reasonable to infer from the fact that the two were silent when the officers reentered the room that they had not spoken to each other while they were alone. Nor do we think that Mrs. Smith's failure to ask the officers questions about the juvenile's rights is any indication that she failed to understand the content of the Miranda warnings which had been read to her on two occasions.

Unlike several other States, see *Hall* v. *State*, 264 Ind. 448, 452 (1976); *Commonwealth* v. *Roane*, 459 Pa. 389, 396 (1974); *In re E.T.C., Juvenile*, 141 Vt. 375, 379-380 (1982), this court has said, at least with regard to juveniles over the age of fourteen, that police officers are not required to give a juvenile and an interested adult an unsolicited opportunity to confer in private. *Commonwealth* v. *Ward, supra* at 397. A private consultation, however, clearly is the most conducive means to the unconstrained and thorough discussion between the adult and child contemplated by our rule. If an adult and a juvenile consult in private, as they did here, the Commonwealth will be unable to prove that the adult has actually used the opportunity to explain to the juvenile the nature of his rights. We think it unwise to impose on the Commonwealth a burden that will have the practical effect of discouraging law enforcement officials from giving the adult and the juvenile the opportunity for private consultation.[6]

This court observed in *Commonwealth* v. *A Juvenile*, *supra* at 135, that "establishment of definite procedures 'has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances state-

---

[6]Investigating officials can only provide a juvenile and an adult the opportunity to confer about the juvenile's rights. They cannot force the adult to speak with the juvenile, nor can they dictate the content of whatever discussion takes place. In addition, we cannot hold a parent or an interested adult to the standards to which we would hold lawyers in explaining a defendant's rights and the possible consequences of waiver. Thus, we do not accept the Appeals Court's suggestion that the Commonwealth must prove that the "consultation conveyed the vital information that [the juvenile] needed to know." 32 Mass. App. Ct. at 729.

ments obtained during such interrogation are not admissible,' " quoting *Fare* v. *Michael C.*, 442 U.S. 707, 718 (1979). The "interested adult" rule strikes a balance between protecting a juvenile's rights, and the legitimate need of law enforcement officials to question juvenile suspects. The interrogating officials here reasonably relied on the presence of the juvenile's mother as an adult interested in his welfare. The two were given an actual opportunity to discuss the juvenile's rights on both occasions on which he was questioned, and between them chose the best course to follow. This was sufficient to satisfy the requirements stated in *Commonwealth* v. *Berry*, *supra*, and *Commonwealth* v. *A Juvenile*, *supra*.[7]

We turn to the judge's alternate basis for suppression, namely, that, under Federal constitutional law, the totality of the circumstances indicated that the juvenile's statements were involuntary. That conclusion, it will be recalled, rested on the juvenile's age and inexperience with police procedure, the height and bearing of the officers, their comments, and the context of the Miranda warnings.

There was nothing to show that the juvenile was impaired, mentally or otherwise, or that investigating officials used threats, promises or subterfuge to induce him to speak. The setting for the interviews, a small office in the fire station, was not forbidding, and the questioning proceeded routinely. We decline to consider requests of the juvenile to tell the truth as coercive practice. The height of the officers is not of

---

[7]The Appeals Court upheld suppression of the statements made during the December 18 interview on the grounds that the juvenile had not himself signed the waiver provisions of the Miranda card and because "there is no suggestion in the record or in the Commonwealth's brief that [the juvenile], by any other act, waived his rights." 32 Mass. App. Ct. at 726.

A written notation of a juvenile's waiver of his rights is not an essential prerequisite to a valid waiver. *Commonwealth* v. *Cain*, 361 Mass. 224, 228 n.2 (1972). Because of the burden imposed on the prosecution in proving a knowing and intelligent waiver of rights, a written notation to this effect by the juvenile may be more persuasive evidence of waiver than is a police officer's assertion that the rights were waived orally. K.B. Smith, Criminal Practice & Procedure §§ 363-364 (1983). Here, the juvenile orally indicated that he wished to waive his rights. This is sufficient.

Commonwealth *v.* Philip S.

significance (and neither is the fact that they carried concealed weapons, which, obviously, were not seen by the juvenile or Mrs. Smith). While it is appropriate to consider the juvenile's youth and inexperience with police procedures, his age and lack of encounter with the police alone would not warrant suppression. Were it otherwise, investigators would not be able to question a thirteen year old boy whom they reasonably suspected of involvement in a serious crime. Miranda warnings were scrupulously furnished, understood, and waived. Officer Dwyer, the officer who gave the juvenile his Miranda warnings during the first interview, indicated that he had advised both the juvenile and his mother that they were free to terminate the interview at any time. Because the interviews occurred in a custodial setting, there was no requirement that the juvenile be told that he was free to leave. Finally, we note that neither Mrs. Smith nor the juvenile testified at the hearing so that no evidence was provided by them upon which a determination of involuntariness could be based. We conclude, therefore, that the juvenile's statements should not have been suppressed as involuntary under a totality of the circumstances analysis.

*Order allowing motion to
suppress reversed.*