Kern, Leila R., J.
This matter came before this court for a hearing on the defendant’s motions to suppress statements he made to Danvers police officers on December 3, 2006. The defendant, Angelo Dilorio, stands charged for one count of Rape of a Child in violation of G.L.c. 265, §23. The indictment alleges *10 that the seventeen-year-old defendant had natural sexual intercourse with an eleven-year-old cousin on or about November 24, 2006. On September 11, 2007, the defendant filed a Motion to Suppress his statements and this court held a hearing on January 8, 2008 and March 24, 2008. This court received a total of eight exhibits into evidence. For the following reasons, the Motion to Suppress is DENIED.
Finding of Facts
This court took evidence on January 8, and March 24, 2008. Based on the weight of the credible evidence and reasonable inferences drawn therefrom, this court finds the following facts.
On December 3, 2006, the Danvers Police received a telephone call from the defendant’s mother, Clementine Dilorio. Mrs. Dilorio reported, on that day she had learned that her son, the defendant, had engaged in sexual intercourse with an eleven-year-old cousin. Officers Tansey and Flynn went to the Dilorio home where they spoke with the defendant’s mother and sister. The defendant was not home. The defendant’s sister contacted the defendant on his mobile phone and handed her mobile phone to Officer Tansey. Officer Tansey asked the defendant to report to the Danvers Police station and tell his side of the stoiy. Officer Tansey told the defendant he did not know whether he would be placed under arrest but that the detective wanted to speak with him. The defendant’s mother asked if she could accompany her son and the officer told her it was not necessary. She decided not to accompany her son.
Shortly after Officer Tansey returned to the police station, the defendant arrived voluntarily. Officer Tan-sey went to speak with the defendant in the lobby, informed him that a detective would speak with him, and asked him to wait there. Dilorio waited in the lobby, a common and open area, for approximately 15 minutes. Detective Robert Sullivan accompanied the defendant into an interview room and Officer Tansey joined them. The defendant was not physically restrained. Both officers testified that the defendant did not appear to be under the influence of drugs or alcohol and the tone of the interview was, at all times, conversational and casual.
Detective Sullivan asked the defendant’s permission to record the interview and the defendant told them that he did not want the interview to be audio or video taped. He declined to sign the release form to tape the interview. Officer Sullivan then read the defendant his Miranda rights and the defendant indicated he understood those rights and signed the waiver form. The officers did not pause after reading each right to ask if the defendant understood that right; however, the defendant gave no indication to the officers that he had trouble understanding what the detective read or told him. After signing the Miranda waiver, the defendant spoke to the officers and shortly thereafter, he wrote a five-page statement about his interactions with his cousin. He also wrote a one-page addendum to supplement his statement. Defendant left the police station before one in the morning.
During the interview, the defendant minimized the nature of his sexual interactions with the victim. He understood the seriousness of his offense, spending a long time distinguishing the fact that he did not penetrate her vagina, only rubbing his penis inside her vaginal area. The defendant’s five-page statement is coherent and he composed it with no help from Detective Sullivan or Officer Tansey. In the statement, the defendant attempts to portray his cousin as the sexual aggressor who initiated the occurrences of sexual conduct. The defendant wrote a one-page addendum, corrected errors, edited his statement, and at the direction of the detective, initialed each change. He signed the bottom of addendum. This court finds that these actions indicate Dilorio understood the nature of his crime, attempted to minimize his fault and the statement, although containing grammatical and spelling errors, was not executed by one with a significantly low level of intelligence or an otherwise impaired ability to understand the proceedings.
At the hearing, the defendant introduced the testimony of Dr. Eric L. Brown, a licensed psychologist, who interviewed the defendant twice. His evaluation and testimony were based on five hours of interview time with the defendant, a half-hour conversation with the defendant’s mother, selected school records, and the defendant’s performance on the Wechsler Adult Intelligence Scale-3d Edition (WAIS-III).
Dr. Brown testified the defendant was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) at an early age and at the time of the police questioning, he was not on any prescription medication. Exh. 6, p. 6. Dr. Brown ran several diagnostic tests on the defendant and determined he had an Intelligence Quotient (IQ) score of 86, which is in the Low Average range (a score of 100 is average). Id. at p. 6. Dr. Brown also reported the defendant had impaired linguistic and conversational abilities. Id. at p. 7. According to Dr. Brown, Dilorio also approaches the world with an eighth-grade education and has a very naive understanding of the world. Exh. 6, pp. 8 & 9. These impaired abilities and naivetes made Dilorio more susceptible to the officers’ authority and power during the questioning. Id. p. at 9. The evaluation also indicated the defendant had difficulty interpreting important social cues and social interactions and thus, Dr. Brown concluded that the defendant was “quite susceptible to being misled and being manipulated by others because of his social immaturity and low functioning intellect when he finds himself in an anxiety provoking situation.” Id. at pp. 7 & 8.
Dr. Brown asked the defendant specific questions about what he understood about his Miranda rights. For example, when asked what his right to remain silent meant, Dilorio replied, “(I]f they’re telling me I *11 have the right to remain silent, how are they going to question me? They told me before that I had to come in for questioning. I didn’t think I had a choice about whether or not I talked: I was there and I had to talk.” Id. at p. 4. Dr. Brown asked the defendant what it meant that his statements could be used against him. The defendant replied, “[l]ike I was saying, I was listening to what he was saying and I said alright. I thought that if I talked, it would help me in court because if I didn’t talk, they would think I was guilty.” Exh. 6, p. 4. Dr. Brown asked the defendant what it meant to have the right to be represented by an attorney, to which the defendant replied, “I thought they meant that if you have an attorney, you can bring him in. I didn’t have one. I didn’t know what an attorney would have done in this situation. I figure that if I didn’t have an attorney already, I couldn’t call one.” Id. at pp. 4-5. The defendant also said, “I don’t remember being told if I changed my mind, I could ask for an attorney ...” Jd. at p. 5.
To the extent Dr. Brown’s testimony and report relied solely on the defendant’s mother’s statements, interviews with the defendant, selected school reports, WAIS-III tests, and other cognitive and linguistic tests, this court finds Dr. Brown’s testimony credible but of limited weight. This court finds, while Dilorio may have some linguistic and cognitive impairments, his impairments are not so severe that they affected his communications with the police officers. This court gives more weight to the testimony of Detective Sullivan and Officer Tansey because they were present at the time of the interview and reported their interactions and impressions at the time the defendant waived Miranda; and, to the defendant’s written statement.
Rulings of Law
Dilorio contends that his statement was the product of a custodial interrogation and to be admissible, he needed to validly waive his Miranda rights. Specifically, the defendant argues that he did not voluntarily, knowingly, and intelligently waive his Miranda rights for two reasons: 1) as a juvenile, he was not afforded an opportunity to meaningfully consult with an adult before he signed the Miranda waiver; and 2) he lacked the mental capability to understand his Miranda rights. The Commonwealth concedes that the defendant’s statement was the product of a custodial interrogation, thus the only issue remaining for this court to decide is whether the defendant voluntarily, knowingly, and intelligently waived his Miranda rights.
The Commonwealth bears the burden of proving that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights before being subjected to custodial interrogation. Commonwealth v. Edwards, 420 Mass. 666, 669 (1995). In determining whether a waiver of Miranda rights was voluntary, “the court must examine the totality of the circumstances surrounding the making of the waiver.” Id. at 670. Factors to be considered in assessing the voluntariness of a waiver include the scrupulousness with which police honor a suspect’s assertion of his rights, the suspect’s mental and emotional state, the place, duration, and circumstances of the interrogation, and whether any improper inducements were offered. Commonwealth v. Magee, 423 Mass. 381, 386-87 (1996). A suspect’s indication that he understands his rights, wants to waive them, and wishes to talk to the police are the strongest signs of his understanding. Commonwealth v. Silva, 388 Mass. 495, 500-02 (1983).
The defendant, seventeen at the time of the interrogation, voluntarily, knowingly, and intelligently waived his Miranda rights. A minor may waive constitutional rights and make a confession which is admissible against him. See Commonwealth v. Tavares, 385 Mass 140, 146 (1982), citing Commonwealth v. Daniels, 366 Mass 601, 605 (1978). “(C)ourts must proceed with ‘special caution’ when reviewing purported waivers of constitutional rights” by juveniles. Commonwealth v. Philip S., 414 Mass. 804, 808 (1993), quoting Commonwealth v. Berry, 410 Mass. 31, 34 (1991); Commonwealth v. A Juvenile, 389 Mass. 128, 133 (1983). In addition, the officers must follow certain procedures when they obtain a minor’s waiver of his Miranda rights. Philip S., 414 Mass. at 809, and cases cited. See Berry, 410 Mass. at 34 (minor under age fourteen must be allowed to consult with a parent or interested adult for Miranda waiver to be valid); Commonwealth v. Alfonso, 438 Mass. 372, 381-83 (2003) (minors who are fourteen years and older must be provided a “genuine opportunity” to meaningfully consult with a parent or interested adult).
Here, the defendant was not considered a minor in the context of the criminal justice system because he was seventeen at the time of the interrogation. See Commonwealth v. Mavredakis, 430 Mass. 848, 855 n. 12 (determining that a defendant, seventeen years old at the time of the interrogation, was no longer a minor, and therefore not afforded juvenile protections as provided in A Juvenile, 389 Mass. at 134-35); Commonwealth v. Guyton, 405 Mass. 497, 498 (1989) (no suppression where defendant was sixteen). The officers were not required to allow the defendant to consult with his mother or an interested adult. Furthermore, both his mother and his twenty-two-year - old sister had called the police regarding the defendant’s alleged crime and both of them knew that he had gone to the police station voluntarily. Therefore, the defendant’s age, alone, does not invalidate his Miranda waiver.
Police are also “entitled to rely on a suspect’s outward behavior" when deciding to proceed with an interrogation. Commonwealth v. Parham, 390 Mass. 833, 839 (1984). Police are not required to ask a suspect about his “age, education, intelligence, phys *12 ical and mental stability, and experience with and in the criminal justice system.” Commonwealth v. Anderson, 445 Mass. 195, 203 (2005). Illiteracy and low intelligence are factors to consider in examining the totality of the circumstances. Commonwealth v. Prater, 420 Mass. 569, 578 (1995). By preparing a five-page statement and one-page addendum in his own words and handwriting, Dilorio showed that he is not illiterate and is of sufficient intelligence to waive his Miranda rights.
In this case, there is no evidence that, at the time of the police interview, Dilorio gave the police any indication or impression that he was incapable of understanding and waiving his Miranda rights. Detective Sullivan read the defendant his rights while the defendant read along on a piece of paper. The defendant acknowledged that he understood his rights and the consequence of speaking to the police when he signed the Miranda form. He further indicated his understanding when he made a five-page written statement, reread it, edited it, and made corrections to it. See Commonwealth v. Mederios, 395 Mass. 336, 347-48 (1985). A defendant’s indication that he understands his rights, waives them, and wishes to talk to the police is the strongest sign of his understanding. See Commonwealth v. Silva, 388 Mass. 495, 500-02 (1983). The defendant also decided he did not want the interview to be audio or video taped, noting he did not like the way he looked or sounded when he was being recorded, showing he understood the police officer’s statements to him. There were no signs indicating to the police the defendant’s waiver was anything but voluntary, knowing, and intelligent.
Therefore, the Commonwealth has met its burden beyond a reasonable doubt that the police officers gave the defendant his full Miranda rights, he fully understood those rights, and he freely, willingly, knowingly, and voluntarily waived those rights. See Commonwealth v. Edwards, 420 Mass. 684, 688 (2004); Commonwealth v. Jackson, 432 Mass. 82 (2000).
ORDER
It is therefore ORDERED that the defendant’s Motion to Suppress be DENIED.